Good morning, Your Honors. Lisa Bassas for Appellant David Unruh. I'd like to make a few comments about procedural issues and then turn to the substantive issues. First, in his brief, Appellee relies on comments by the State Sentencing Court to uphold the aggravated terms, even including a copy of the sentencing transcript in its excerpts of record. However, to the extent, in other words, its argument is premised on judge-found facts to support its argument that the aggravated terms should be upheld, which is what Cunningham found unconstitutional. Thus, to the extent Appellee rests on such comments to support its claim that no sentencing error was committed in this case, those comments should be disregarded. Second, Appellee contends that the Court need only concern itself with Count 5, which was the determinant term relating to child endangerment with the use of a gun. But this ignores not only that the COA was granted with respect to all of the State, to the sentencing on all the State counts, which was 2, 3, 4, 5, and 6. It also ignores the import of a State term. A State only becomes permanent upon the successful completion of the sentence for the most serious conviction. Therefore, in effect, all portions of the judgment remain in effect, even the State counts. If this Court finds necessary, if this Court finds sentencing error, it's necessary to modify the judgment as to all of the State counts, 2, 3, 4, 5, and 6, not just Count 5, as Appellee seems to advocate. The District Court found that the Cunningham error committed in this case was harmless, because a jury would necessarily have found that the crimes were committed with great viciousness and callousness. The State agrees and contends that the unprovoked shooting of a mother and a child was an act of irrational and unexplained rage, the result of no adequate provocation, leading to an act of extreme violence highly disproportionate to the circumstances. First, I'd like to correct a misconception. There was no shooting of the child. Appellant fired a shot at the mother. We do know the facts. He shot the mother in the face, and then as she was sitting there bleeding, he points a gun, a bigger gun. He goes and gets a bigger gun and says, oh, I didn't do such a good job. I mean, he doesn't say it, but basically, you know, since I didn't manage to kill the mother with one shot in the face, I'm going to get a bigger gun and hold it to the child's head. And he does that for about a minute? Yes. I mean, that's... Yes, but according to Appellee, defendant fired a shot, tried to shoot both the mother and the child. Okay. We'll accept the version that Judge Kaczynski just outlined. How is that not almost inevitable? I mean, in my mind, I don't see how it doesn't lead to the result that the jury is going to find the same conclusion. Well, I disagree, and the reason being...   First of all, any criminal who commits an act of attempted murder with the use of a gun or an assault commits an act of extreme violence frighteningly disproportionate... Well, if he had stopped after he shot the mother in the face, we'd have a different case. I mean, he shoots the mother in the face. She's sitting there bleeding. She doesn't die. That's attempted murder. And there might or might not be, but, you know, that's entirely debatable whether that's particularly cruel. I mean, you use a gun and people are going to bleed. There's no doubt about it. But then he goes a couple of extra steps. I mean, you know, first of all, he involves the child, and that sort of evokes... You know, here's this mother who is already in pain, suffering from bleeding from being shot, but sort of does perhaps the cruelest thing you can do to a mother, and that is to threaten the life of the child. And there is a certain... You know, it's not how he wheels around and then points the same gun at the child. He actually goes out and gets a bigger gun so he can, you know, really sort of make the threat really effective. I guess I have the same question as Judge Clifton. How is that not inevitably cruel? According to the case law, you need something distinctly worse than the ordinary. We already have child endangerment. You need something unique to the circumstances of the case. But you could have child endangerment without the mother present or without having a threat. I mean, here you have the mother bleeding, having been shot in the face, perhaps in danger of her life. I mean, being shot in the face, even with what was a .22 or something, is no small business. And instead of having sort of being able to sort of take care of herself and try to call for her, you know, do whatever to try to save herself, she has to worry about her child being threatened. I mean, I don't know. That's a lot more than your ordinary act of violence. There is no indication that this was gratuitous, that he did it to torture the mother. If anything, the statement she gave in the hospital and to the police shortly after the crime was committed is that this was an accidental shooting. Was it an accident that he held a gun to the head of a 13-year-old boy for a couple of minutes while the boy's mother is bleeding on the floor? That's not an accident, was it? She wasn't bleeding on the floor. Where was she bleeding? She was obviously bleeding. She ran into the bathroom. She came out with a compress on her face. And he did ñ it wasn't accidental. I'm not trying to say it was accidental that he held a gun to the son's head. That was deliberate. But what was ñ I do believe that the shooting was accidental. You have a Marine who was in the Marine Corps for a number of years. He had multiple firearms in the house. He worked for the Marine as a civilian employee for 23 years later. This is a man who, if he took aim at her head, could have shot her. But there's a response to it. Even if we accept the proposition it was an accident, although that doesn't seem consistent with a conviction for first-degree attempted murder, but let's accept that. His response after that is not to go to her aid. It's to get a bigger gun and hold it to the head of a 13-year-old boy, the woman's son. He did do that. He felt ñ That's not an accident, was it? But according to the case law, I believe it's the Collins case, although I could have that wrong, but it is ñ let's see what it is. Yes, it's the Collins case. Under California law, one who holds a gun to a person for an extended period shows callousness and viciousness in the commission of a crime. And by parody reasoning, one who holds a gun to a person for a few moments, which is what occurred in this case, is not the same kind of callousness. It is not distinctly worse than the ordinary. He's already been punished ñ Well, but you're forgetting it is not simply the holding the gun on the son but holding the gun on the son in the presence of the mother. I mean, he essentially was holding the gun on the ñ as I understand it, on the son to basically threaten the mother. She wanted to leave and it was all about intimidating her. And the way he intimidates her, he first shoots her, and then he intimidates her by threatening the life of her child. I just have a hard time believing that Joy wouldn't find that to be cruel. I would disagree with the facts. I think it's the son who wanted to leave. Terry came into the bedroom because he wanted to go out bike riding. And he came in, he entered the room, he saw his mother had been shot. And my client, I think, got scared, didn't want him to leave, and tried to hold him. And then Terry ñ Sterling came out of the bathroom, saw Terry being held. She pleaded with Mr. Unruh, the defendant, to let him go, and he did. He did let Terry go. And then he came to Sterling's assistance. According to Appelli, he did not provide any aid, but he did. He immediately attended to Sterling. He brought bandages. He brought her into the living room. He called 911. He called the police. He called for an ambulance. And he stayed with her, tending to her wounds, until emergency personnel arrived. So I don't ñ he did attend to her wounds. He did show remorse, which contradicts what the state sentencing court found. He did ñ what he did was inappropriate to the circumstances, but I do believe that the charge defenses ñ You have about a minute left. Do you want to save it for a bottle? Yes, I'll finish up my sentence. The enhancements for the use of a gun and great bodily injury already take into account these additional circumstances. Thank you. Thank you. Good morning, Your Honor. May it please the Court, I'm Kevin Vietta. I'm a California Deputy Attorney General, here for appellee and respondent in this matter. In the state courts, Mr. Unruh never seems to have challenged the substantive determination that the aggravating circumstances were established. In fact, in the state court at the sentencing hearing, his counsel essentially conceded that they were properly found, or that they could properly be found by the trial court. That's in the supplemental excerpts of the record, I think at page 7. What does that buy you? I mean, he's saying it was a long-time fact. Maybe he thought this judge wouldn't be swayed. I mean, I don't know who the judge was, but he might have said, you know, a lawyer might have thought this judge won't be swayed, but if I had 12 jurors, maybe I could sway them. So I'm not sure that the fact that he doesn't challenge the determination, given the kind of area of God, that buys you anything. I would agree with you, Your Honor, that it doesn't resolve the question completely, but I think it is an indication how practitioners in California courts view these determinations or viewed them at the time. The district court correctly found them. Well, there's no doubt that these were very strong facts, I mean, for the ‑‑ for aggravation. But I can certainly imagine a situation, or I can conceive a situation where you might say, well, you know, it's not going to help you any, you know, to argue for the judge, but if we had a jury here, we could make a case. But, you know, it's a different ‑‑ I think the prosecutor had a much stronger view. I mean, you've tried cases. You know, juries can be harder than judges and can be easier than judges. Correct. And the California Supreme Court sort of recognized in People v. Sandoval that these sentencing aggravating factors are standards more than rules. That is, there is a certain amount of vagueness that's unavoidable and continues to adhere in them. But in this case, the district court was exactly correct that any jury would have found this crime, this series of crimes, to have been particularly callous. And in particular, I think a factor that was noted by this court is that what happened after the shooting demonstrated a continuing callousness, a selfishness, a lack of empathy for the victims. That is, he grabbed the boy and said to the boy, you're not going anywhere. We're all going to Texas. So after shooting in the face the woman with which he'd had a relatively minor argument and certainly no egregious provocation, after that he is still trying to influence the decision of who's going to Texas. He thought of his ‑‑ he was concentrating on his desires and only his desires even after he had shot someone in the face. And that demonstrates in a way that any jury I think would find a callousness that qualifies this case for ‑‑ qualifies that crime for aggravated sentencing. The ‑‑ I think a jury might look at this situation and say this is a domestic argument that got way out of hand and is in a different class than, say, a hired killer or somebody who tortures people for pleasure. I'm not saying those are the only categories, but you might say, well, you know, this was a guy. He got in a domestic argument. He felt he was losing his family or, you know, whatever kind of things happened. And he did some crazy stuff. He did some crazy stuff, but all within a short period of time. And we can sort of feel for him. We can feel that, you know, sure we don't approve it, all that, but it's not cruelty. It was really desperation on his part. A jury might view it that way. Certainly a jury might well see the loss of a family as a provoking instance, but not one that warrants shooting someone in the face. I mean, he wasn't trying to get money out of them. He wasn't trying to ‑‑ I mean, this is his family. It's not like holding a gun to somebody and saying, you know, I'm going to shoot your son if you don't give me the money. This was not somebody who was saying, you know, I want to watch a squirm because I enjoy. You know, it was a guy who lost control. Lost control. Dangerously, internationally lost control. And that's why he's in prison. And nobody is saying he shouldn't be in prison for a very long time. The question is whether it's really established beyond doubt or beyond whatever the standard is. That a jury wouldn't have come to a different conclusion. The Brecht standard is substantial and injurious effect on the jury's determination or here on the sentence. We think not. That is, because of the explosiveness, the irrationality, the continued danger, the continuing selfishness, as you've indicated, Your Honor, he didn't do it demanding money. No, he did it demanding that his girlfriend and her son accompany him to Texas. That's what he told the boy as he held him. But those are essentially different kind of motivations. Money sort of cold-hearted, you know, desire for financial gain. This is, he says, basically he's trying to keep his little family together. And he's saying, they are coming with me. You know, I want you with me. I want you, you know, it's a warped expression of love. No, it's definitely warped and definitely out of control and definitely needs to be punished. But I don't know. Is it clear that a jury would have found that to be unusually cruel? He certainly, the trial judge, saw this as unusually cruel, callous, violent, and saw him as a danger. How much is at stake here? Eight years. Eight years. From 40 to 48 years? Correct, Your Honor. And what about this point that opposing counsel made about the state sentences? I must say, I did not focus enough on those in preparing because I, you know, they were stayed and I didn't want to think about them, or, you know, I didn't think I needed to think about them. Why don't you give me your view of that? If the matter is returned to the state court, an entire sentencing will occur. The court will have to make a determination of which count will be the upper term or which count will be the base count and whether they would sentence on the same count or not. So I'm confident that the entire matter would be evaluated by the state. So it would all come back into play and presumably, again, this is hypothetical. If it went back, it would go before a jury. No, it would not, Your Honor. The California Supreme Court in Sandoval, the case that I cited, reformed the statute after Cunningham and said that, and reformed the statute in a way that said there won't be jury sentencing. There still is no jury sentencing in California on aggravating or mitigating factors. What happened was both the legislature changed the statute to say that the middle term is no longer the presumptive term and gave and made the upper portion or the upper sentence the upper term, or the upper range for the sentence the upper term. So sentencing occurs in California, including on cases that have been returned for resentencing. That goes only to the judge. And there's no ex post facto problem with that? Well, the California Supreme Court said there's no ex post facto problem with that in Sandoval. And I think this court has reached the same conclusion, but I haven't briefed that. And the reason it said not ex post facto is because it's a procedural change rather than a substantive one. Okay. So I believe it would be returned for complete resentencing before a judge, and the difference would be if a middle term is given and otherwise the sentencing remained the same, then Mr. Unruh would be facing a term of 40 years to life, 8 years for the crimes against the boy, and still 32 years to life for the crime and sentence that's not before this court. May I just make sure I understand this, that the issue is solely the enhancement of the, or the upper term for the boy? We're not considering at this point what he did to the mother? Precisely, Your Honor. And it can be any one of three factors? Yes. You talked about the viciousness and callousness, which is factor one. If it were not vicious and callous, but it were that the victim is particularly vulnerable, or that the conduct indicates a serious danger to society, you would still prevail on, so that the appellant has to show that it's none of the three? Correct, Your Honor. Because we've only discussed viciousness and callousness. I think I at least was reading from my notes on danger to society for part of it as well, because I think that the viciousness and callousness, the factors that apply there, also would apply to the question about whether he is a danger to society, and we believe that his unexplainable impulsivity and very dangerous and dangerous behavior of shooting someone in the face, that as someone who's familiar with firearms, as my opposing counsel has indicated, winds up hitting this woman in the face. Don't we have to sort of add 40 years to his life and decide whether the guy comes out at whatever age he'll be at that time? Is it likely to be a danger to society? I think he's likely not to be a danger to society when he finishes 40 years in prison, Your Honor. He'll be 90 years old, but not dangerous then, but he was dangerous at the time of sentencing. So we're talking about what might happen to him between ages 90 and 98? I think it's more like 80 and 88. I mean, the other paradox is that the State of California invited him to return to the state courts after Cunningham, and he chose not to. We suggested that the Cunningham claim was not, in the district court, was not exhausted because of the change in the law worked by Cunningham and the United States Supreme Court. Let me ask you a question, which occurs to me in lots of cases. Is it really important to the State of California that it maintain this extra eight years after, what, he's 80? I think he would be approximately 80 years old when he's first eligible for parole. So do you really care about this extra eight years after he's 80? I think the answer to that question is probably not, but that's not an answer for me to decide. That's an answer for the district attorney in San Bernardino County to decide. If this court should, and though I don't think you should, but if this court should say resentence him, I believe I'd like to see the writ for the grant of conditional relief to leave it to the district attorney, whether to simply accede to the middle term or to retrial. What authority does the attorney general have in a case like this? Our writ, Your Honor, is to defend convictions, defend lawful convictions. All convictions, no matter what? Only, no, Your Honor, lawful ones, ones that we see as lawful. All right. If you agree that it's not lawful, then you confess error. Yes, we would. But you have no discretion in the attorney general's office to not defend a writ that's lawful, but. I believe that answer is correct, Your Honor. That is, we don't have the authority to force the district attorney to choose one way or another, that is, whether to retry this for sentencing. The district attorney does not work for, does not work. No, no, but to defend a case. Yes. For example, do you have authority in deciding whether to take a case to the Supreme Court? Were we to reverse? Does the attorney general have authority? Yes, Your Honor. Yes, why? We do have that authority. Not to? To decide not to, whether to or not. Our practice is to confer with the district attorney in those matters. But is the choice of the counsel of record, the attorney general, to decide whether the case was. And is that true with this case? Would that be true with this case? I mean, not the Supreme Court, but would you have authority not to defend against this appeal? I don't know. I mean, the honest answer is I don't know. I don't think so. I mean, I think if we believe that the law has been properly applied, that there's no violation of law, I think we do have a duty to defend the case. I'm not really questioning you because of this case. I'm just interested. We see you in your office frequently here. And I never understood what your authority was and what discretion you had. And I think that's certainly understandable. Our position is different from that of the United States attorney, who is both the trial prosecutor and the appellate prosecutor and the jailer and the respondent in those matters. I would say that those different functions are distributed among various officials in California. Thank you. Okay. Thank you. Your Honors, just a final remark. Regarding the element of dangerousness to society, I think any criminal who is convicted has been found by the State of California to pose a danger to society. I don't think that there's anything distinctly worse than the ordinary about Mr. Unruh to warrant an enhanced term based on this factor. If the Court has any further questions, I will submit. Thank you. Okay. Thank you, Your Honors. Case is argued. We stand submitted.
judges: Kozinski, Reinhardt, Clifton